IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| MARY QUIRK, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>LIBERTY BANK,<br><br>Defendant. | Civil Action No.:<br><br><br>**CLASS ACTION PETITION**<br><br>**JURY TRIAL DEMANDED** |

### CLASS ACTION COMPLAINT

Plaintiff Mary Quirk ("Plaintiff"), on behalf of herself and all persons similarly situated, alleges the following based on personal knowledge as to allegations regarding herself and on information and belief as to other allegations.

### INTRODUCTION

1. Plaintiff brings this action on behalf of herself and classes of all similarly situated consumers against Defendant Liberty Bank ("Liberty" or "Bank" or "Defendant"), arising from the Bank's routine practices of assessing overdraft fees ("OD Fees") on transactions that did not actually overdraw the account.

2. This practice breaches contractual promises; violates the covenant of good faith and fair dealing; and/or violates Connecticut consumer protection law.

3. Liberty's customers have been injured by its improper practices to the tune of millions of dollars bilked from their accounts in violation of their agreements with Liberty. As one example, Plaintiff Quirk paid over $2,000 in OD Fees to Liberty in 2018 alone.

4. On behalf of herself and the Classes, Plaintiff seeks damages, restitution, and injunctive relief for Defendant's violations as set forth more fully below.

1

## PARTIES

5.      Mary Quirk is a resident of Marlborough, Connecticut and holds a Liberty checking account.

6.      Defendant Liberty is engaged in the business of providing retail banking services to consumers, including Plaintiff and members of the putative Classes, which includes the issuance of debit cards for use by its customers in conjunction with their checking accounts. Liberty is headquartered in Middletown, Connecticut and has more than $5 billion in assets and 55 banking offices throughout the central, eastern, western and shoreline areas of Connecticut.

## JURISDICTION AND VENUE

7.      This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005.  Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because the aggregate claims of the putative class members exceed $5 million, exclusive of interest and costs, and at least one of the members of the proposed classes is a citizen of a different state than Liberty.

8.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Liberty is subject to personal jurisdiction here and regularly conducts business in this District, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this district.

## FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

### I.   LIBERTY CHARGES OD FEES ON TRANSACTIONS THAT DO NOT ACTUALLY OVERDRAW THE ACCOUNT

**A.  Overview of Claim**

9.      Plaintiff brings this cause of action challenging Liberty's practice of charging overdraft fees on what are referred to in this Complaint as "Authorize Positive, Purportedly Settle

Negative Transactions" (APPSN Transactions").

10. Here's how it works. At the moment debit card transactions are authorized on an account with positive funds to cover the transaction, Liberty immediately reduces consumers' checking accounts for the amount of the purchase, sets aside funds in a checking account to cover that transaction, and as a result, the consumer's displayed "available balance" reflects that subtracted amount. As a result, customers' accounts will always have sufficient available funds available to cover these transactions because Liberty has already sequestered these funds for payment.

11. However, Liberty still assesses crippling $33 OD Fees on many of these transactions, and misrepresents its practices in its account documents.

12. Liberty maintains a running account balance in real time, tracking funds consumers have for immediate use. This running account balance is adjusted, in real-time, to account for debit card transactions at the precise instance they are made. When a customer makes a purchase with a debit card, Liberty sequesters the funds needed to pay the transaction, subtracting the dollar amount of the transaction from the customer's available balance. Such funds are not available for any other use by the accountholder, and such funds are specifically associated with a given debit card transaction.

13. Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure that there are enough funds in the account to pay the transaction when it settles, as discussed in the Federal Register notice announcing revisions to certain provisions of the Truth in Lending Act regulations:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which

may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498-01 (Jan. 29, 2009).

14. That means when any *subsequent*, intervening transactions are initiated on a checking account, they are compared against an account balance that has already been reduced to account for any earlier debit card transactions. This means that many subsequent transactions incur OD Fees due to the unavailability of the funds sequestered for those debit card transactions.

15. Still, despite keeping those held funds off-limits for other transactions, Liberty improperly charges OD Fees on APPSN Transactions, even though APPSN Transactions *always* have sufficient available funds to be covered.

16. Indeed, the Consumer Financial Protection Bureau ("CFPB") has expressed concern with this very issue, flatly calling the practice "unfair" and/or "deceptive" when:

> A financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive. At one or more institutions, examiners found deceptive practices relating to the disclosure of overdraft processing logic for electronic transactions. Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status. But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall net impression created by the disclosures. Examiners therefore concluded that the

disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive. Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing fees under these circumstances was found to be unfair.

CFPB, Winter 2015 "Supervisory Highlights."

17. There is no justification for these practices, other than to maximize Liberty's overdraft fee revenue. APPSN Transactions only exist because intervening checking account transactions supposedly reduce an account balance. But Liberty is free to protect its interests and either reject those intervening transactions or charge OD Fees on those intervening transactions—and it does the latter to the tune of millions of dollars each year. But Liberty was not content with these millions in OD Fees. Instead, it sought millions *more* in OD Fees on APPSN Transactions.

18. Besides being unfair and unjust, these practices breach contract promises made in Liberty's adhesion contracts—contracts which fail to inform consumers about the true nature of Liberty's processes and practices. These practices also exploit contractual discretion to gouge consumers.

19. In plain, clear, and simple language, the checking account contract documents covering overdraft fees promise that Liberty will only charge overdraft fees on transactions that have insufficient funds to cover that transaction:

> **Overdrafts:** If a check or other debit is presented to us for payment from your Account which is in excess of the balance available for withdrawal (see our **Funds Availability Information** in **Part III** of this Agreement) in your Account (plus the unused portion of any overdraft protection line of credit you may have with us), we may refuse to honor that check or debit, due to "insufficient funds" in your Account. If we wish, we may pay the check or other debit even though it results in a negative balance in your Account or causes your overdraft protection credit limit to be exceeded. If we pay the check or other debit and you do not have an overdraft

> protection agreement with us, the negative balance will constitute a loan to you and you must pay it back immediately.
>
> We may charge a fee every time a check or other debit against your Account is presented to us for payment which would result in a negative balance in your Account or cause your overdraft protection credit limit to be exceeded. We may charge this fee regardless of whether the check or other debit arises from an in-person withdrawal, a check, an electronic fund transfer, or any other type of debit transaction. We may charge this fee whether or not we pay the check or other debit.

Personal Deposit Account Agreement ("Account Agreement") at 8, attached hereto as Ex. A.

20. In short, Liberty is not authorized by the Account Agreement, or any other contract, to charge OD Fees on transactions that have not overdrawn an account, but it has done so and continues to do so.

### B. Mechanics of a Debit Card Transaction

21. A debit card transaction occurs in two parts. First, authorization for the purchase amount is instantaneously obtained by the merchant from Liberty. When a merchant physically or virtually "swipes" a customer's debit card, the credit card terminal connects, via an intermediary, to Liberty, which verifies that the customer's account is valid and that sufficient available funds exist to "cover" the transaction amount.

22. At this step, if the transaction is approved, Liberty immediately decrements the funds in a consumer's account and sequesters funds in the amount of the transaction, but does not yet transfer the funds to the merchant.

23. Sometime thereafter, the funds are actually transferred from the customer's account to the merchant's account.

24. There is no change—no impact whatsoever—to the available funds in an account when this step occurs.

### C. Liberty's Account Contract

25. Plaintiff Quirk has a Liberty checking account, which is governed by Liberty's

standardized Account Agreement.

26.     The Account Agreement and relevant contract documents covering overdraft fees provide that Liberty will not charge OD Fees on transactions that have sufficient funds to cover them at the time they are initiated.

27.     Liberty promises that "available" balance is the balance used to determine overdrafts; that "available" funds are reduced for holds, including those placed immediately on debit card transactions; that overdrafts are determine when an accountholder "attempt[s] to initiate a debit transaction that would exceed the balance available for withdrawal in [the] Account"; and that held funds are used to pay for the transaction for which they are held:

> Please be aware that the order in which transactions are received and processed may affect the balance available for withdrawal from your Account and the total amount of overdraft fees incurred by you. You agree that you will not write a check or otherwise attempt to initiate a debit transaction that would exceed the balance available for withdrawal in your Account (taking into account the unused portion of any overdraft protection line of credit you may have with us, and taking into account any pending checks, withdrawals and other debit transactions you have initiated). In general, all checks written by you are processed by Liberty Bank in check number order (lowest to highest). Generally, preauthorized credits will post before preauthorized debits, which will post from lowest amount to highest amount. Other transactions, such as ATM withdrawals, in-person withdrawals, debit card transactions, telephone-initiated transfers or other electronic transfers may be processed in the order in which they are received. You agree that we do not have to process checks, withdrawals or other debit transactions in the order in which they occur or in the order in which we receive them. We may charge your Account for checks and electronic debits as soon as we receive any electronic or other notice of the check or electronic debit, even if we have not yet received the actual check or electronic debit for processing. Alternatively, we may place a "hold" on funds in your Account in an amount equal to a check or electronic debit, as soon as we receive any electronic or other notice of the check or electronic debit. If we do this, we do not have to make the funds that are subject to a "hold" available to you for withdrawal or to pay any check or electronic debit from your Account, apart from the check or debit that was the reason for our putting the funds on "hold."

Account Agreement at 7.

28.     Via this provision of the Account Agreement, Liberty promises that it uses available

balance—the same balance that is immediately reduced when a debit card transaction is authorized—to determine whether an overdraft occurs.

29. For APPSN Transactions, which are immediately deducted from a positive account balance and held aside for payment of that same transaction, there are always funds to cover those transactions—yet Liberty assesses OD Fees on them anyway.

30. The above promises indicate that transactions are only overdraft transactions when they are authorized and approved into a negative account balance. Of course, that is not true for APPSN Transactions.

31. In fact, Liberty actually authorizes transactions on positive funds, sets those funds aside on hold, then fails to use those same funds to "post" those same transactions. Instead, it uses a secret posting process described below.

32. The above representations and contractual promises are untrue. Liberty charges OD Fees even when sufficient funds exist to "cover" transactions that are "authorized" on a positive balance. No express language in any document states that Liberty may impose OD Fees on APPSN Transactions.

33. The Account Agreement misrepresents, and misleadingly omits pertinent information, regarding Liberty's true debit card processing and OD Fee practices.

34. First, and most fundamentally, Liberty charges OD Fees on debit card transactions for which there are sufficient funds available to cover the transactions. That is despite contractual representations that Liberty will only charge OD Fees when there are insufficient available funds to cover a given transaction.

35. Contrary to the contractual representations, Liberty assesses OD Fees on APPSN Transactions that _**do**_ have sufficient funds available to cover them throughout their lifecycle.

36. Liberty's practice of charging OD Fees even when sufficient available funds exist to cover a transaction violates a contractual promise not to do so. This discrepancy between Liberty's actual practice and the contract causes consumers like the Plaintiff to incur more overdraft fees than they should.

37. Next, sufficient funds for APPSN Transactions are actually debited from the account immediately, consistent with standard industry practice.

38. Because these withdrawals take place upon initiation, they cannot be re-debited later. But that is what Liberty does when it re-debits the account during a secret batching posting process.

39. In reality, Liberty's actual practice is to assess the same debit card transaction twice to determine if the transaction overdraws an account—both at the time a transaction is authorized and later at the time of settlement.

40. At the time of settlement, however, an available balance *does not change at all* for these transactions previously authorized into positive funds. As such, Liberty cannot then charge an OD Fee on such a transaction because the available balance has not been rendered insufficient due to the pseudo-event of settlement.

41. Upon information and belief, at the moment a debit card transaction is getting ready to settle, Liberty does something new and unexpected. During the middle of the night, during its nightly batch posting process, Liberty releases the hold placed on funds for the transaction for a split-second, putting money back into the account, then re-debits the same transaction a second time.

42. This secret step allows Liberty to charge overdraft fees on transactions that never should have caused an OD Fee—transactions that were authorized into sufficient funds, and for

which Liberty specifically set aside money to pay them.

43. This discrepancy between Liberty's actual practices and the contract causes consumers to incur more OD Fees than they should.

44. Further evidence that Liberty represents to its customers that OD Fees will not be charged on APPSN transactions is language included in the Welcome Kit it delivers when accounts are opened:

> What causes an overdraft against my checking account? This can happen *if you attempt to withdraw more money* than you have in your account. Any of the following transactions, when in excess of your available balance can cause an overdraft: check, debit card transaction at a merchant, cash withdrawal at an ATM, automatic payment or other electronic transaction. (Emphasis added.)

45. The phrase "attempt to withdraw more money" is reasonably understood as being consistent with the contract language alleged above. For debit card transactions, the attempt to withdraw money comes at the time of authorization when the debit card is swiped.

### D. Liberty Abuses Contractual Discretion

46. Liberty's treatment of debit card transactions to charge OD Fees is not simply a breach of the express terms of the numerous account documents. In addition, Liberty also exploits the contractual discretion, if any, afforded to Liberty to the detriment of accountholders when it uses these policies.

47. Liberty uses any contractual discretion on whether or not to charge an OD Fee to cause APPSN Transactions to incur OD Fee by knowingly authorizing later transactions that it allows to consume available funds previously sequestered for APPSN Transactions.

48. Liberty uses its contractual discretion points unfairly to extract OD Fees on transactions that no reasonable consumer would believe could cause OD Fees.

### E. Reasonable Consumers Understand Debit Card Transactions are Debited Immediately

49. The assessment of OD Fees on APPSN Transactions is fundamentally inconsistent with immediate withdrawal of funds for debit card transactions. That is because if funds are immediately debited, they cannot be depleted by intervening transactions (and it is that subsequent depletion that is the necessary condition of APPSN Transactions). If funds are immediately debited, then, they are necessarily applied to the debit card transactions for which they are debited.

50. Liberty was and is aware that this is precisely how accountholders reasonably understand debit card transactions to work.

51. Liberty knows that many consumers prefer debit cards for these very reasons. Consumer research indicates that consumers prefer debit cards as a budgeting device; because they don't allow debt like credit cards do; and because the money comes directly out of a checking account.

52. Consumer Action, a national nonprofit consumer education and advocacy organization, advises consumers determining whether they should use a debit card that "[t]here is no grace period on debit card purchases the way there is on credit card purchases; the money is immediately deducted from your checking account. Also, when you use a debit card you lose the one or two days of 'float' time that a check usually takes to clear." *See* https://www.consumer-action.org/helpdesk/articles/what_do_i_need_to_know_about_using_a_debit_card (last visited November 14, 2018).

53. Further, Consumer Action informs consumers, "Debit cards offer the convenience of paying with plastic without the risk of overspending. When you use a debit card, you do not get a monthly bill. You also avoid the finance charges and debt that can come with a credit card if not paid off in full."

54. That is a large part of the reason that debit cards have risen in popularity. The

number of terminals that accept debit cards in the United States has increased by approximately 1.4 million in the last five years, and with that increasing ubiquity, consumers have (along with credit cards) viewed debit cards "as a more convenient option than refilling their wallets with cash from an ATM."[1]

55. Not only have consumers increasingly transitioned from cash to debit cards, but they believe that a debit card purchase is the fundamental equivalent of a cash purchase, with the swipe of a card equating to handing over cash, permanently and irreversibly.

56. Liberty was aware of a consumer perception that debit transactions reduce an available balance *in a specified order*—namely, the moment they are actually initiated—and its Account Agreement only supports this perception.

### F. Plaintiff Quirk's Debit Card Transactions

57. On June 25, 2018, Plaintiff Quirk was assessed a $33.00 OD Fee on a debit card transactions that settled on that day, specifically a $44.10 debit card transaction at Chili's restaurant that Liberty authorized against a positive available balance on June 23, 2018, despite the fact that positive funds were deducted immediately, prior to June 25, 2018, for the transaction on which Plaintiff was assessed an OD Fee.

58. Plaintiff Quirk does not dispute that Liberty was within its rights to charge an OD Fee on any debit card transaction authorized into insufficient funds. Plaintiff Quirk disputes that Liberty was authorized to charge an OD Fee on the prior in time debit card transaction.

59. In addition, on July 6, 2018, Plaintiff Quirk was assessed a $33.00 OD Fee on a debit card transactions that settled on that day, despite the fact that positive funds were deducted

---

[1] Maria LaMagna, *Debit Cards Gaining on Case for Smallest Purchases,* MarketWatch, Mar. 23, 2016, http://www.marketwatch.com/story/more-people-are-using-debit-cards-to-buy-a-pack-of-gum-2016-03-23.

immediately, prior to July 6, 2018, for the transaction on which Plaintiff was assessed an OD Fee.

## II. CLASS ACTION ALLEGATIONS

60. Plaintiff brings this action on behalf of herself and on behalf of all others similarly situated pursuant to F.R.C.P. 23. The Classes include:

> All persons who hold a Liberty checking account who, within the applicable statute of limitations preceding the filing of this lawsuit, were charged OD Fees on transactions that were authorized into a positive available balance (the "Class").
>
> All Connecticut citizens who hold a Liberty checking account who, within the applicable statute of limitations preceding the filing of this lawsuit, were charged OD Fees on transactions that were authorized into a positive available balance (the "Connecticut Subclass").

61. Excluded from the Classes are Defendant, Defendant's subsidiaries and affiliates, their officers, directors and member of their immediate families and any entity in which Defendant has a controlling interest, the legal representatives, heirs, successors or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

62. Plaintiff reserves the right to modify or amend the definition of the proposed Classes and/or to add a Subclass(es) if necessary before this Court determines whether certification is appropriate.

63. The questions here are ones of common or general interest such that there is a well-defined community of interest among the members of the Classes. These questions predominate over questions that may affect only individual class members because Liberty has acted on grounds generally applicable to the Classes. Such common legal or factual questions include, but are not limited to:

   a) Whether Liberty improperly charged OD Fees on APPSN Transactions;

   b) Whether the conduct enumerated above violates the contract;

  c) Whether the conduct enumerated above violates the covenant of good faith and fair dealing;

  d) Whether any of the conduct enumerated above violates the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a ("CUTPA"); and

  e) The appropriate measure of damages.

64. The parties are so numerous such that joinder is impracticable. Upon information and belief, and subject to class discovery, the Classes consist of thousands of members or more, the identities of whom are within the exclusive knowledge of and can be ascertained only by resorting to Liberty's records. Liberty has the administrative capability through its computer systems and other records to identify all members of the Classes, and such specific information is not otherwise available to Plaintiff.

65. It is impracticable to bring members' of the Classes individual claims before the Court. Class treatment permits a large number of similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort, expense, or the possibility of inconsistent or contradictory judgments that numerous individual actions would engender. The benefits of the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

66. Plaintiff's claims are typical of the claims of the other members of the Classes in that they arise out of the same wrongful business practices by Liberty, as described herein.

67. Plaintiff is an adequate representative of the Classes in that Plaintiff has a Liberty checking account and has suffered damages as a result of Liberty's contract violations, Liberty's violations of the covenant of good faith and fair dealing, and Liberty's violation of Connecticut consumer protection law. In addition:

a) Plaintiff is committed to the vigorous prosecution of this action on behalf of herself and all others similarly situated and has retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of consumers against financial institutions;

b) There is no conflict of interest between Plaintiff and the unnamed members of the Classes;

c) Plaintiff anticipates no difficulty in the management of this litigation as a class action; and

d) Plaintiff's legal counsel has the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

68. Plaintiff knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

69. Liberty has acted or refused to act on grounds generally applicable to each of the classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to each of the classes as a whole.

70. All conditions precedent to bringing this action have been satisfied and/or waived.

## COUNT I
## BREACH OF CONTRACT
### (On Behalf of Plaintiff and the Classes)

71. Plaintiff repeats, realleges, and incorporates by reference each of the foregoing paragraphs of this Complaint as if fully set forth herein.

72. Plaintiff and Liberty contracted for checking account and debit card services, as embodied in the Account Agreement, a binding and valid adhesion contract between the parties.

73. Liberty breached the terms of the Account Agreement when it assessed overdraft fees ("OD Fees") on transactions that did not actually overdraw Plaintiff's account.

74. Plaintiff and members of the putative Classes have performed all of the obligations on them pursuant to the Account Agreement.

75. Plaintiff and members of the putative Classes have sustained monetary damages as

a result of each of Defendant's breaches.

## COUNT II
## BREACH OF THE COVENANT OF
## GOOD FAITH AND FAIR DEALING
## (On Behalf of Plaintiff and the Classes)

76. Plaintiff repeats, realleges, and incorporates by reference each of the foregoing paragraphs of this Complaint as if fully set forth herein, except for Count I to which is pled in the alternative.

77. Plaintiff and Liberty contracted for checking account and debit card services, as embodied in the Account Agreement.

78. Connecticut law implies a covenant of good faith and fair dealing in every contract. The covenant of good faith and fair dealing constrains Defendant's discretion to abuse self-granted contractual powers.

79. This good faith requirement extends to the manner in which a party employs discretion conferred by the Account Agreement.

80. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit – not merely the letter – of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract, in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

81. Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes his conduct to be justified. A lack of good faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Examples of violations of good faith and fair dealing are evasion of the spirit of the bargain, willful rendering of imperfect performance,

abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

82. Liberty breached the covenant of good faith and fair dealing when it assessed OD Fees on transactions that did not actually overdraw the account, and by abusing any contractual discretion in assessing OD Fees.

83. Each of Defendant's actions was done in bad faith and was arbitrary and capricious.

84. Plaintiff and members of the putative Classes have performed all of the obligations on them pursuant to the Account Agreement.

85. Plaintiff and members of the putative Classes have sustained monetary damages as a result of each of Defendant's breaches of the covenant of good faith and fair dealing.

### COUNT III
### CUTPA
### (On Behalf of Plaintiff and the Connecticut Subclass)

86. Plaintiff repeats, realleges, and incorporates by reference each of the foregoing paragraphs of this Complaint as if fully set forth herein.

87. At all times relevant hereto, Plaintiff and members of the Connecticut Subclass were "persons" within the meaning of CUTPA (C.G.S. § 42-110a, *et seq.*).

88. Liberty's practice of charging overdraft fees on APPSN Transactions as described herein is an unfair and deceptive act and practice in violation of C.G.S. § 42-110b(a).

89. As a result of Liberty's fraudulent and unfair business practices, Plaintiff and other members of the Connecticut Subclass have suffered ascertainable losses within the meaning of C.G.S. § 42-110g(a) and have been damaged by Liberty's unlawful acts.

90. Liberty's fraudulent and deceptive acts and practices present an ongoing threat and likelihood of deception to members of the public and constitute a fraud upon the members of the

public, as well as unfair, unlawful, and deceptive acts, in violation of CUTPA.

91.    Liberty engaged in the unfair or deceptive acts or practices described herein with intent that others rely upon its concealment, suppression and/or omission of material facts, and acted intentionally, or at a minimum, with reckless disregard for Plaintiff's rights and the rights of the Connecticut Subclass members.

92.    As a direct and proximate result of the foregoing acts and/or omissions of Liberty, Plaintiff and members of the Connecticut Subclass were damaged in an amount to be determined at trial, which Plaintiff and members of the Connecticut Subclass are entitled to recover, together with appropriate penalties, including punitive damages, attorneys' fees, and costs of suit.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the Classes, demands a jury trial on all claims so triable and for judgment as follows:

A.    For an order certifying the proposed Classes pursuant to Federal Rule of Civil Procedure 23, appointing the Plaintiff as representative of the Classes and appointing counsel for Plaintiff as counsel for the respective Classes;

B.    Declaring that Defendant's policies and practices as described herein constitutes a breach of contract, a breach of the covenant of good faith and fair dealing, and/or a violation of CUTPA;

C.    Enjoining Defendant from the wrongful conduct as described herein;

D.    Awarding restitution of all fees at issue paid to Defendant by Plaintiff and the Classes as a result of the wrongs alleged herein in an amount to be determined at trial;

E.    Compelling disgorgement of the ill-gotten gains derived by Defendant from its misconduct;

F.  Awarding actual and/or compensatory damages in an amount according to proof;

G.  Punitive and exemplary damages;

H.  Awarding pre-judgment interest at the maximum rate permitted by applicable law;

I.  Reimbursing all costs, expenses, and disbursements accrued by Plaintiff in connection with this action, including reasonable attorneys' fees, costs, and expenses, pursuant to applicable law and any other basis; and

J.  Awarding such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff and all others similarly situated hereby demand trial by jury on all issues in this Complaint that are so triable as a matter of right.

Dated:  July 12, 2019            By:   /s/ James E. Miller

        James E. Miller
        Laurie Rubinow
        **SHEPHERD, FINKELMAN, MILLER & SHAH, LLP**
        65 Main Street
        Chester, CT 06412
        Tel:  860-526-1100
        Fax:  800-300-7367
        jmiller@sfmslaw.com
        lrubinow@sfmslaw.com

        Jeffrey Kaliel (*Pro Hac Vice* to be filed)
        Sophia Gold (*Pro Hac Vice* to be filed)
        **KALIEL, PLLC**
        1875 Connecticut Avenue NW, 10th Floor
        Washington, DC 20009
        Tele: (202) 350-4783
        jkaliel@kalielpllc.com
        sgold@kalielpllc.com

Hassan A. Zavareei (*Pro Hac Vice* to be filed)
Andrea Gold (*Pro Hac Vice* to be filed)
**TYCKO & ZAVAREEI LLP**
1828 L Street NW, Suite 1000
Washington, DC  20036
Telephone: (202) 973-0900
Facsimile: (202) 973-0950
hzavareei@tzlegal.com
agold@tzlegal.com

Jeff Ostrow (*Pro Hac Vice* to be filed)
Jonathan M. Streisfeld (*Pro Hac Vice* to be filed)
**KOPELOWITZ OSTROW FERGUSON WEISELBERG GILBERT**
One West Las Olas Boulevard, Suite 500
Fort Lauderdale, FL 33301
Telephone: (954) 525-4100
Facsimile: (954) 525-4300
ostrow@kolawyers.com
streisfeld@kolawyers.com


**ATTORNEYS FOR PLAINTIFF AND THE PROPOSED CLASSES**